*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

COMMITTEE FOR MARSHALL-NOT THE
MEGASITE,

   Plaintiff-Appellant/Cross-Appellee,

and

REGIS KLINGLER, STEPHANIE KLINGLER,
HOLLY HARNDEN, MARK ROBINSON,
GRETCHEN ESSER, JAMES SLEIGHT, JR., and
DIANE KOWALSKE,

   Plaintiffs,

v

CITY OF MARSHALL and MICHELLE EUBANK
in her capacity as the MARSHALL CITY CLERK,

   Defendants-Appellees,

and

MARSHALL AREA ECONOMIC
DEVELOPMENT ALLIANCE,

   Intervening Defendant-Appellee,

and

MICHIGAN ECONOMIC DEVELOPMENT CORP.
and MICHIGAN STRATEGIC FUND,

   Cross-Appellants.

FOR PUBLICATION
February 25, 2026
10:09 AM

No. 369603
Calhoun Circuit Court
LC No. 2023-001712-CZ

ON REMAND

-1-

Before: CAMERON, P.J., and SWARTZLE and YOUNG, JJ.

CAMERON, P.J.

This case returns to us on remand from our Supreme Court "for reconsideration in light of *Clam Lake Twp v Dep't of Licensing and Regulatory Affairs*, 500 Mich 362[; 902 NW2d 293] (2017)." *Comm for Marshall-Not the Megasite v Marshall*, 25 NW3d 318 (Mich 2025) (*Marshall II*). For the reasons set forth below, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This case arose in February 2022 when the City of Marshall (the City) entered into a land transfer agreement with Marshall Township (the Township). This agreement—the Master 425 Agreement—contemplated that the City and the Township would enter into individual "425 Agreements"[1] for individual transfers and provided the rules for these agreements. Under the Master 425 Agreement and the Joint Municipal Planning Act, 2003 PA 226, MCL 125.141 *et seq*., the City and Township also established the Joint Municipal Planning Commission (the JPC). Under the Master 425 Agreement, the JPC would "control all land usages for lands subject to a 425 Agreement between the City and Township." The rules for the JPC's operations were provided in Schedule A to the Master 425 Agreement. Relevant to this appeal, Schedule A specified whether the City's or the Township's zoning definitions and procedures applied to specific property based on certain geographical boundaries. It instructed that these lands "shall be administered" by the JPC "pursuant to" either the City's or the Township's "zoning and planning acts" and either the City's or the Township's "procedures and definitions will be followed by the JPC."

In February 2023, the Marshall Board of Trustees and Marshall City Council approved various conditional land transfers under individual 425 agreements with different individual property owners. These property owners ultimately transferred their property to the Marshall Area Economic Development Alliance (the MAEDA), and the MAEDA sought and obtained approval to combine the properties into a single parcel. It also obtained approval to split off some of the parcel for a proposed development of the Ford BlueOval Battery Park. The MAEDA applied to the JPC to rezone this split-off parcel to the City's new Industrial and Manufacturing Complex (I-3) zoning designation—a special classification the City adopted specifically for this parcel to be used for what would be known as the Marshall Megasite. The JPC denied the MAEDA's request.

During the same time, the City sought rezoning from the Marshall City Council. After the MAEDA first applied for rezoning, but before the JPC denied the request, the City Clerk, Michelle Eubank, published a Notice of Public Hearing before the Marshall City Council regarding the rezoning application. The notice was published in the Ad-Visor and Chronicle, a local weekly publication, on April 15, 2023. The City Council scheduled the hearing for May 1, 2023. About

---

[1] The agreements are referred to as "425" agreements because the law permitting these transfer agreements, MCL 124.21 *et seq*., was originally enacted by 1984 PA 425. Hence, the applicable statute is commonly referred to as "Act 425."

two weeks before the hearing, on April 17, 2023, the City Council introduced Ordinance 2023-08. The City then held the hearing as planned on May 1, 2023, and adopted the ordinance. The ordinance rezoned the parcel at issue into the I-3 designation. It also included appropriations of $40,000 for site plan review services and $250,000 for building inspection services for the proposed development project.

Plaintiff-petitioners formed a ballot question committee (the Committee) to challenge Ordinance 2023-08 by referendum. They signed an affidavit agreeing that they would "be responsible for circulating the referendum petition and for filing it in proper form." The specific petitioners, as well as others, collected 810 signatures and filed them with Eubanks. Eubanks rejected the petition by serving the Committee with a Certification of Insufficiency, citing two reasons. First, the petition was invalid because Ordinance 2023-08 was not subject to referendum because it contained appropriations. Second, the number of properly collected signatures was insufficient to subject the ordinance to a referendum. The Marshall City Council subsequently upheld Eubank's decision and the Committee and petitioners (plaintiffs) filed suit.

Plaintiffs' original complaint sought: Count I, mandamus, Count II, injunctive relief, and Count III, declaratory relief. After defendants moved for summary disposition, the trial court permitted plaintiffs to amend their complaint. The amended complaint restated the original counts and added Count IV, seeking declaratory relief for purported violations to the Master 425 Agreement, and Count V, seeking declaratory relief regarding improper notice of Ordinance 2023-08. Throughout the legal proceedings, several groups moved to intervene. The trial court granted the MAEDA's motion but denied the Michigan Economic Development Corporation's (the MEDC) and the Michigan Strategic Fund's (the MSF) motions. The City and Eubank again moved for summary disposition, which the trial court granted as to all counts.

The Committee appealed the order dismissing its claims to this Court. The MEDC and the MSF cross-appealed the trial court's order denying their motions to intervene. This Court affirmed, *Comm for Marshall-Not the Megasite v Marshall*, ___ Mich App ___, ___; ___ NW3d ___ (2024); slip op at 25 (*Marshall I*), vacated by *Marshall II*, 25 NW3d at 318, but our Supreme Court vacated our prior opinion "for reconsideration in light of" *Clam Lake*, *Marshall II*, 25 NW3d at 318.

## II. SUMMARY DISPOSITION STANDARDS

We review a trial court's decision on a motion for summary disposition de novo. *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 159; 934 NW2d 665 (2019). "A motion under MCR 2.116(C)(8) tests the legal sufficiency of a claim based on the factual allegations in the complaint." *Id*. (emphasis omitted). "When considering such a motion, a trial court must accept all factual allegations as true, deciding the motion on the pleadings alone." *Id*. at 160. "A motion under

MCR 2.116(C)(8) may only be granted when a claim is so clearly unenforceable that no factual development could possibly justify recovery." *Id*.[2]

## III. MANDAMUS

The Committee first argues that the trial court erred by dismissing its Count I claim for a writ of mandamus. We disagree.

## A. STANDARDS OF REVIEW

Contrary to our de-novo review of summary disposition decisions, *id*. at 159, we review a trial court's decision on whether to issue a writ of mandamus for an abuse of discretion, *CB by Next Friend Macika v Livingston Co Comm Mental Health*, 349 Mich App 253, 262; 27 NW3d 355 (2023). "A court abuses its discretion when its decision is outside the range of reasonable and principled outcomes." *Id*. (quotation marks and citation omitted). The issue of whether a party has standing is reviewed de novo. *MCNA Ins Co v Dep't of Technology, Mgt, and Budget*, 326 Mich App 740, 743; 929 NW2d 817 (2019).

## B. STANDING

As a threshold matter, we again reject the MAEDA's argument that the Committee lacks standing. The MAEDA's reliance on "authorities related to appeals to zoning boards and circuit courts rather than standing to challenge a zoning decision in the first place[]" does not properly address the issue raised. *Marshall I*, ___ Mich App at ___; slip op at 8-9, citing *Sakorafos v Charter Twp of Lyon*, 349 Mich App 176, 185; 27 NW3d 329 (2023) ("Standing and legal capacity to sue are distinct concepts[.]"). The MAEDA's reliance on the Zoning Enabling Act, MCL 125.3101 *et seq*. (ZEA), which limits who can challenge a zoning ordinance, is misplaced. The ZEA limits "who may appeal the administrative actions of zoning officials[;]" it does not limit private citizens from making direct challenges to an ordinance itself. *Sakorafos*, 349 Mich App at 190; *Marshall I*, ___ Mich App at ___; slip op at 9. In this respect, the Committee has standing if it "has a special injury or right, or substantial interest, that will be detrimentally affected in a manner different from the citizenry at large[.]" *Lansing Sch Ed Ass'n v Lansing Bd of Ed*, 487 Mich 349, 372; 792 NW2d 686 (2010). As we explained in *Marshall I*, ___ Mich App at ___; slip op at 9:

> Here, the petitioners formed the Committee and had it petition for a referendum on Ordinance 2023-08. The City's charter specifically provided standing to do just that. See Marshall Charter, § 5.02. Once Eubank certified the petition as insufficient, the Committee had standing to challenge the decision by

---

[2] The Committee argues that the trial court erroneously relied on a superseded complaint when granting summary disposition to defendants. But, as we explained in *Marshall I*, this argument is waived because the Committee did not raise it before the trial court. *Tolas Oil & Gas Exploration Co v Bach Servs & Mfg, LLC*, 347 Mich App 280, 289; 14 NW3d 472 (2023).

Eubank and to challenge the City's decisions to approve Eubank's decision through a writ of mandamus, see MCR 3.305(A)(2), because it had a "substantial and distinct interest" in ensuring that its petition for a referendum was not improperly certified as insufficient, see *Lansing Sch Ed Ass'n*, 487 Mich at 374.[3]

## C. ENTITLEMENT TO MANDAMUS

Nevertheless, the Committee was not entitled to a writ of mandamus. "The primary purpose of the writ of mandamus is to enforce duties created by law where the law has established no specific remedy and where, in justice and good government, there should be one." *Taxpayers for Mich Constitutional Gov't v Michigan*, 508 Mich 48, 81; 972 NW2d 738 (2021) (quotation marks and citation omitted). As a result:

> To obtain this extraordinary remedy, the plaintiff bears the burden of showing that (1) the plaintiff has a clear, legal right to performance of the specific duty sought, (2) the defendant has a clear legal duty to perform, (3) the act is ministerial, and (4) no other adequate legal or equitable remedy exists that might achieve the same result. [*Id*. at 81-82 (quotation marks and citation omitted).]

The Committee was not entitled to mandamus because it did not have a clear legal right to get the referendum on the ballot and because there was an alternative remedy at law. *Id*.

A clear legal right is one that is "clearly founded in, or granted by, law; a right which is inferable as a matter of law from uncontroverted facts[.]" *Attorney General v Bd of State Canvassers*, 318 Mich App 242, 249; 896 NW2d 485 (2016) (quotation marks and citation omitted). Marshall Charter § 5.01(b) prohibits referenda on ordinances that contain appropriations. Ordinance 2023-08, the ordinance at issue, included appropriations for "$40,000 for site plan review services and $250,000 for building inspection services for the development of the proposed industrial project . . . ."[4] The trial court correctly held that, because Ordinance 2023-08 included appropriations, the Committee had no clear legal right to a referendum. *Taxpayers for Mich Constitutional Gov't*, 508 Mich at 81-82.[5] Moreover, the trial court correctly concluded that

---

[3] For this same reason, the Committee also had standing to challenge whether the City Council could lawfully include appropriations in the ordinance, because those provisions directly resulted in Eubanks's decision to certify the petition as insufficient. It also has direct-challenge standing regarding notice. Moreover, as we explained in our prior opinion, the Committee had standing to challenge Ordinance 2023-08 even though it did not exist until after the ordinance was passed because organizations have the same standing as their members to assert claims. *Lansing Sch Educ Ass'n*, 487 Mich at 373 n 21.

[4] We address the issue as to whether the ordinance was permitted to contain such appropriations below.

[5] Because Eubanks correctly certified the petition as insufficient on the basis of the lack of a legal right, the trial court also properly dismissed the Committee's Count II seeking injunctive relief. Count II was premised on Marshall Charter, § 5.05, which provides: "When a referendum petition

mandamus was precluded because of the existence of an adequate remedy at law. Marshall Charter § 5.04(c) provides that the City Council's final determination was subject to judicial review. Thus, because there was an alternative remedy at law capable of producing the same desired result, mandamus was unavailable. *Taxpayers for Mich Constitutional Gov't*, 508 Mich at 82. The trial court correctly dismissed the Committee's Count I.[6]

## IV.  APPROPRIATIONS

The Committee next argues that the trial court erred in determining that the City could include the appropriations in Ordinance 2023-08 and dismissing Count III. We disagree.

## A.  STANDARDS OF REVIEW

We review the proper interpretation and application of the City's ordinances and charter de novo. *Gmoser's Septic Serv, LLC v East Bay Charter Twp*, 299 Mich App 504, 509; 831 NW2d 881 (2013); *Barrow v City of Detroit Election Comm'n*, 301 Mich App 404, 411; 836 NW2d 498 (2013). The trial court's decision on a motion for a preliminary injunction is reviewed for an abuse of discretion. *Slis v Michigan*, 332 Mich App 312, 335; 956 NW2d 569 (2020). A trial court abuses its discretion when it makes a decision that falls outside the range of reasonable and principled outcomes. *Id*.

## B.  APPROPRIATIONS BY ORDINANCE

We begin by rejecting the Committee's contention that Ordinance 2023-08 is invalid because the Marshall Charter prohibits passing appropriations by ordinance. To the contrary, § 5.01(b) expressly contemplates them. See Marshall Charter, § 5.01(b) (addressing the procedure for a referendum and providing specific exclusions for ordinances "relating to the appropriation of money or levy of taxes."). As we noted in *Marshall I*, Article IV of the City's charter imposes certain limitations on the City Council's authority to legislate by resolution, but these same limitations do not apply to legislation by ordinance. This distinction again leads us to conclude that "legislation by ordinance [is] the default, whereas legislating by resolution [is] permissible only when one of the criteria stated under Marshall Charter, § 4.01(c), applie[s]." *Marshall I*, ___ Mich App at ___; slip op at 14-15. While § 4.01(d) requires legislation by ordinance when specific criteria exist, nothing precludes legislation by ordinance in other situations. "In short, nothing in

---

is timely filed with the city clerk, the ordinance sought to be reconsidered shall be suspended from taking effect." But the provision goes on to explain that the suspension terminates when "there is a final determination of insufficiency of the petition[.]" Marshall Charter, § 5.05(a). The Committee had no valid claim for injunctive relief because it was not entitled to suspension of Ordinance 2023-08 after Eubanks certified it as insufficient.

[6] Because the Committee had no legal right to a referendum and there existed an adequate remedy at law, we need not address whether the other two requirements for mandamus were satisfied. Additionally, because plaintiffs were not entitled to a referendum, Eubanks's decision to invalidate some of the signatures is moot.

Article IV prevented the [C]ity [C]ouncil from legislating an appropriation by ordinance." *Marshall I*, ___ Mich App at ___; slip op at 15.

We also reject the Committee's contention that the City Charter's requirement that annual budget appropriations be passed by resolution, not ordinance, somehow curtails the City Council's authority to use ordinances to appropriate money for a particular project. The Committee points to § 9.05, which provides: "Not later than the first meeting of the council in June, the council shall, by resolution, adopt all budgets for the next year and shall, in such resolution, make an appropriation of the money needed for municipal purposes during the ensuing fiscal year . . . ." Marshall Charter, § 9.05. But, as we explained in *Marshall I*, "the requirement to act by resolution" in this section, "by its own terms, applie[s] only to the adoption of the initial budget for the coming fiscal year; it [does] not prevent the [C]ity [C]ouncil from making any appropriation otherwise permitted under the charter in an ordinance during the fiscal year." *Marshall I*, ___ Mich App at ___; slip op at 16.

The Committee, still focusing on the City's approved annual budget, relies on Marshall Charter, § 9.06, which states: "After the budget has been adopted, no money shall be drawn from the treasury of the city nor shall any obligation for the expenditure of money be incurred, except pursuant to the budget appropriation." But, as we explained in *Marshall I*, ___ Mich App at ___; slip op at 15:

> The prohibition against drawing money from the treasury or incurring obligations, "except pursuant to the budget appropriation," does not prohibit the City from spending money on matters not included in the budget. City governments routinely confront unanticipated circumstances that sometimes result in unanticipated expenses which require them spend money on contingencies that arise during the fiscal year. The limitation stated under Marshall Charter, § 9.06, most naturally means that the [C]ity [C]ouncil must limit its draws and pay its debts within the parameters set by the budget.

We reject the Committee's strained interpretation that § 9.06 constrains the City's appropriation authority to the fiscal year budgeting process, thereby limiting all appropriations to resolutions. Such a rigid interpretation "would require us to view the budgeting process in a silo without considering the provisions that give the [C]ity [C]ouncil the ability to respond to changing conditions throughout the fiscal year." *Marshall I*, ___ Mich App at ___; slip op at 15. Moreover, as we already noted, § 5.01(b) expressly contemplates that appropriations can be made in an ordinance. Marshall Charter, § 5.01(b). "If that were not the case, then there would be no need to exempt ordinances that contain appropriations from the power of referendum." *Marshall I*, ___ Mich App at ___; slip op at 16-17.

We similarly reject the Committee's argument that the power to authorize borrowing by "ordinances or resolution," under Marshall Charter, § 9.08, necessarily suggests that the transfer of funds under § 9.06 must be done by resolution. The Committee's interpretation is contrary to § 4.01. The charter requires "[a]ll legislation of the city" to be done "by ordinance or by resolution[.]" Marshall Charter, § 4.01(a). The City Council's ability to act by resolution is "limited to matters required or permitted by law, or this charter," or for matters relating to "the internal concerns of the city." Marshall Charter, § 4.01(c). But, as discussed, while § 4.01(d)

requires legislation by ordinance when specific criteria exist, nothing precludes legislation by ordinance in other situations. Again, the charter, read as a whole, suggests that legislation by ordinance is the default, while legislation by resolution is limited to certain situations. Because legislation by ordinance is the default, the ability to do so need not to be specifically authorized.[7] Thus, the provision that states borrowing may be done by ordinance or resolution in § 9.08 was merely authorizing the act by resolution *in addition to* the default ability to act by ordinance. See Marshall Charter, § 4.01(c). Along the same vein, § 9.06 omitting any reference to the method for performing the transfer simply means that only the default method—transfer by ordinance— applies, because the provision does not authorize the transfer by resolution. See *id*.

The City's charter must be liberally construed in favor of the exercise of its power. See Marshall Charter, § 1.05. Accordingly, because the charter contains no express or implied prohibition on appropriations by ordinance, the trial court did not err when it concluded that Ordinance 2023-08 was not unlawful for including appropriations.

## C. TITLE-OBJECT RULE

The Committee's argument that the appropriations in Ordinance 2023-08 violate the charter's title-object rule is also without merit.

As we explained in *Marshall I*, ___ Mich App at ___; slip op at 17:

> The charter provides, in relevant part, that "no ordinance shall contain more than one subject, and the ordinance title must clearly express that subject." Marshall Charter, § 4.02(a). This limitation is substantially similar to the title-object clause in Michigan's constitution. See Const 1963, art 4, § 24 ("No law shall embrace more than one object, which shall be expressed in its title."). The purpose of such clauses is to "prevent the Legislature from passing laws not fully understood, to ensure that both the legislators and the public have proper notice of legislative content, and to prevent deceit and subterfuge." *Enbridge Energy, LP v Michigan*, 332 Mich App 540, 545-546; 957 NW2d 53 (2020) (quotation marks and citation omitted). . . .

> When reviewing a title-object challenge, this Court must make "all possible presumptions" in favor of constitutionality and must construe the title "reasonably,

---

[7] We note that the Committee's argument on this point seems to suggest the opposite: that, in order for an action to be done by ordinance, the section authorizing the action must provide as much. This argument is belied by the plain language of § 4.01, which mandates that actions be by resolution or ordinance, but only imposes limitations on resolutions. If action by ordinance had to be specifically provided for in each section as well, then the sections in the Marshall Charter that do not mention either method of action would leave the City Council without any authorized method of action. Indeed, the Committee's interpretation would mean that § 9.06 itself is unworkable, as it does not explicitly permit the transfers by resolution or ordinance.

not narrowly and with unnecessary technicality." *Advisory Opinion re Constitutionality of 1972 PA 294*, 389 Mich 441, 464; 208 NW2d 469 (1973).

Relevant to this appeal, the Committee asserts that the appropriations in Ordinance 2023-08 violate the charter's title-object rule.

> A title-body challenge is an assertion that the body of an act exceeds the scope of its title. However, the title of an act is not required to serve as an index to all of the provisions of the act. The goal of the clause is notice, not restriction of legislation. A title will only fail to give fair notice if the subject in the body is so diverse from the subject in the title that they have no necessary connection. Even if not directly mentioned in the title of the act, if the title comprehensively declares a general object or purpose, a provision in the body is not beyond the scope of the act as long as it is germane, auxiliary, or incidental to that general purpose[.] [*Enbridge Energy, LP*, 332 Mich App at 546 (quotation marks and citations omitted).]

Ordinance 2023-08 is entitled: "AN ORDINANCE TO AMEND THE ZONING MAP OF THE CITY OF MARSHALL SO AS TO CHANGE THE ZONING OF A PARCEL OF REAL PROPERTY, PARCEL #53-281-021-00, FROM TOWNSHIP ZONING TO INDUSTRIAL AND MANUFACTURING COMPLEX (I-3)." The Committee contends that the ordinance has a title-body defect because the title does not mention appropriations, and a change in zoning has no connection to the appropriation of money for services for a development project. The Committee's argument fails because the specific appropriations are germane to the purpose of Ordinance 2023-08. *Enbridge Energy, LP*, 332 Mich App at 546. The title does not merely note that the City was changing the zoning map generally; it specifically indicates that the change was for a specific parcel and a specific zoning classification that was expressly created for the project that the appropriations were designed to support. Thus, the appropriations for funding the project are clearly "germane, auxiliary, or incidental to that general purpose[,]" *id*. (quotation marks and citation omitted), and "directly relate[d] to," and designed to "carry out and implement" the zoning change, *Advisory Opinion re Constitutionality of 1972 PA 294*, 389 Mich at 465.

This same reasoning defeats the Committee's multiple-object challenge. "The 'object' of a law is its general purpose or aim." *Ray Twp v B & BS Gun Club*, 226 Mich App 724, 731; 575 NW2d 63 (1997). Legislation does not contain multiple objects "solely because it contains more than one means of attaining its primary purpose." *Id*. "Instead, a violation exists only where the law contains subjects so diverse that they have no necessary connection." *Id*. Here, the appropriations were related to the specific zoning change identified in the title of Ordinance 2023-08. Further, these appropriations were designed to carry out and implement the objective of the zone change: the Blue Oval Battery Park. Accordingly, the appropriations did not comprise a subject "so diverse" as to "have no necessary connection[]" to the goal reflected in the title. *Id*.

The trial court did not err when it determined that Ordinance 2023-08 did not violate Marshall Charter, § 402(a). Therefore, the trial court's dismissal of the Committee's Count III was appropriate.

## V. COMPLIANCE WITH THE CHARTER'S NOTICE REQUIREMENT

The Committee next argues that the trial court erred in dismissing Count V, a request for declaratory relief based on an alleged violation of the charter's notice requirements. We disagree.

### A. STANDARD OF REVIEW

We review the proper interpretation and application of the City's ordinances and charter de novo. *Gmoser's Septic Serv, LLC*, 299 Mich App at 509; *Barrow*, 301 Mich App at 411.

### B. TIMELY PUBLICATION

Marshall Charter, § 4.02(b) requires that, after the introduction of any ordinance, the city clerk must "publish a summary of the proposed ordinance in a local newspaper of general circulation in the city, together with a notice setting out the time and place for a public hearing on the proposed ordinance[,]" and mandates that "the public hearing may not be held sooner than five (5) days after the publication[.]" The Committee argues that the City violated the charter by providing late notice of the ordinance at issue. Specifically, it asserts that the City started publishing its summary and notice on April 15, 2023, two days before it actually introduced Ordinance 2023-08. We again conclude that this argument fails because the specific publication used in this case was a weekly publication, and:

> We, therefore, treat the publication as having been published continuously every day through to the new issue date—April 22, 2023. The City's notice, therefore, was effectively published anew every day, which included the day after Ordinance 2023-08 was introduced. See, e.g., *Leffler v Armstrong*, 4 Iowa 482 (1857) (stating that a notice is published continuously from the first day the paper includes the notice until the first issue without the notice); see also *Hinchman v Barns*, 21 Mich 556, 558 (1870) (stating that publication means taking some act to put the paper before the public) [*Marshall I*, ___ Mich App at ___; slip op at 20].

Nothing in the charter precludes the City from providing notice through a weekly publication, and it is undisputed that the notice was published more than five days before the meeting was held. Thus, the notice complied with Marshall Charter, § 4.02(b).

As we explained in *Marshall I*, ___ Mich App at ___; slip op at 21, the Committee's argument that the notice was insufficient because it did not also mention the proposed appropriations fails, because the charter "does not specify what a summary must include to constitute adequate notice[,]" and "[a] general summary is sufficient when the law governing notice does not require more." Citing *North Burns Park Ass'n v Ann Arbor*, 155 Mich App 686, 691; 400 NW2d 622 (1986). The notice summary provided in this case "clarified that the *primary* purpose of the ordinance was to change the zoning for a specific parcel of property; that summary was adequate for purposes of noticing the public hearing." *Marshall I*, ___ Mich App at ___; slip op at 21, citing *North Burns Park Ass'n*, 155 Mich App at 691. While the issue of appropriations is "central to this appeal," the appropriations themselves were "far from the primary purpose of the ordinance." *Marshall I*, ___ Mich App at ___; slip op at 21. We conclude that the City provided adequate notice under the charter, and the trial court correctly dismissed Count V.

## VI. THE MASTER 425 AGREEMENT

Our Supreme Court has directed us to reconsider our opinion in light of *Clam Lake Twp*, 500 Mich at 362. *Marshall II*, 25 NW3d at 318. We conclude that, while *Clam Lake Twp* renders some of our previous opinion's general analysis incorrect, the trial court still did not err when it dismissed the Committee's claim in Count IV that Ordinance 2023-08 violated the Master 425 Agreement.

### A. STANDARD OF REVIEW

The issue of whether a party has standing is reviewed de novo. *MCNA Ins Co*, 326 Mich App at 743.

### B. STANDING

As we previously explained, the trial court erred by concluding that the Committee lacked standing to seek declaratory judgment related to the Master 425 Agreement:

> To the extent that the Committee was attempting to sue under the Master 425 Agreement—an agreement to which it was not a party—to compel the City to change its zoning, it would lack standing to enforce the agreement. See *Bloomfield Estates Improvement Ass'n, Inc v Birmingham*, 479 Mich 206, 212-213; 737 NW2d 670 (2007). See also *Brunsell v Zeeland*, 467 Mich 293, 296; 651 NW2d 388 (2002) (stating that incidental beneficiaries to a contract cannot sue to enforce it under the third-party beneficiary statute). But that is not what the Committee was doing. Rather, it sued for a declaration that Ordinance 2023-08 was void because the City did not have the authority to pass Ordinance 2023-08 given that the City bargained away its authority to change the zoning for parcels governed by the Master 425 Agreement. The Committee would have standing to assert that claim for the same reasons that it had standing to sue for a declaration that Ordinance 2023-08 was void for failure to follow the charter's notice provisions. See *Washington Gas Energy Servs, Inc v Dist of Columbia Pub Serv Comm*, 893 A2d 981, 988-989 (DC, 2006); *Town of Lima v Robert Slocum Enterprises, Inc*, 38 App Div 2d 503, 506; 331 NYS2d 51 (1972). [*Marshall I*, ___ Mich App at ___; slip op at 21-22.]

While the trial court erred by dismissing the Committee's claim on standing grounds, dismissal was still appropriate. See *Bailey v Antrim Co*, 341 Mich App 411, 420; 990 NW2d 372 (2022) ("we will not reverse a trial court's decision when it reaches the right result, even it if was for the wrong reason.").

### C. WHETHER THE CITY COULD CONTRACT OUT ITS ZONING POWER

In *Marshall I*, ___ Mich App at ___; slip op at 22, this Court reasoned that the City did not violate the Master 425 Agreement because a municipality cannot contract out its zoning authority. This broad statement was contrary to our Supreme Court's holding in *Clam Lake Twp*. MCL

125.26(c) permits that "a contract under this act[,]" in other words, a 425 contract, may provide for "the adoption of ordinances and their enforcement by or with the assistance of the participating local units." In *Clam Lake Twp*, 500 Mich at 381, our Supreme Court reasoned that the plain language of the statute "authorize[s] local units to bargain over the adoption of ordinances, which includes bargaining over their content and substance." This includes zoning ordinances. *Id.* at 381-382. The Court explained that "a township has no inherent power to zone and can only do so to the extent the power is granted by the Constitution or Legislature[,]" and, thus, the Legislature could, and did, "empower . . . municipalities to zone or take action by agreement even though the agreement will bind those municipalities in the future and constrain their legislative discretion." *Id.* at 382-383 (quotation marks and citations omitted).

But *Clam Lake Twp* is distinguishable from this case. *Clam Lake Twp* involved a 425 contract between two townships. *Id.* at 368. *Clam Lake Twp* held that the statute authorized "local units" to bargain over ordinances. *Id.* at 381-382. This is because MCL 124.26(c) explicitly covers "participating local units." The act defines "local unit" as "a city, township, or village." MCL 124.21(b). The entity to which the City is alleged to have contracted out its zoning power— the JPC—does not qualify as a "local unit" under the statute. Thus, to the extent *Clam Lake Twp* held that the plain statutory language permitted municipalities to contract out their zoning ordinance power to other municipalities, we conclude that the same statutory language does not authorize the transfer of zoning authority to a recipient that is not a "participating local unit." We note that other subsections of MCL 124.26 suggest that the contract terms it authorizes for these 425 transfers are limited to those involving the participating local units, not a contractually created entity like the JPC:

> If applicable to the transfer, a contract under this act may provide for any of the following:
>
> (a) Any method by which the contract may be rescinded or terminated by *any participating local unit* before the stated date of termination.
>
> (b) The manner of employing, engaging, compensating, transferring, or discharging personnel required for the economic development project to be carried out under the contract.
>
> (c) The fixing and collecting of charges, rates, rents, or fees, where appropriate, and the adoption of ordinances and their enforcement by or with the assistance of the *participating local units*.
>
> (d) The manner in which purchases shall be made and contracts entered into.
>
> (e) The acceptance of gifts, grants, assistance funds, or bequests.
>
> (f) The manner of responding for any liabilities that might be incurred through performance of the contract and insuring against any such liability.
>
> (g) Any other necessary and proper matters agreed upon by the *participating local units*. [MCL 124.26 (emphasis added).]

Our goal in statutory interpretation is to give effect to the Legislature's intent. *Houghton Lake Area Tourism & Convention Bureau v Wood*, 255 Mich App 127, 134; 662 NW2d 758 (2003). "If the statute defines a term, that definition must control." *Id*. "If the statute is unambiguous, this Court must not engage in judicial construction." *Id*. "This Court must presume the Legislature intended the meaning it expressed[,]" and "should generally not speculate about the Legislature's intent beyond the words actually used in the statute." *Id*. at 134-135. "Specifically, this Court should assume that an omission was intentional." *Id*. at 135. Along this vein, under the doctrine of *expression unius est exclusio alterius* (the expression of one thing is the exclusion of another), where the Legislature grants certain authority to a specific defined entity, this inclusion "operates to exclude" the provision of such authority to other unnamed entities. See, e.g., *Detroit City Council v Detroit Mayor*, 283 Mich App 442, 456; 770 NW2d 117 (2009).

We conclude that the plain language of MCL 124.26(c) permits "participating local units" to contract out their zoning-ordinance powers to one another under a 425 contract. The absence of any statutory language permitting the contracting of these powers out to non-"participating local units" means no such authority exists. *Detroit City Council*, 283 Mich App at 456. Under our cannons of statutory interpretation, the City lacked the statutory authority to transfer its zoning power to the JPC. Therefore, any provisions in the Master 425 Agreement that purport to do so are unenforceable. See *Wasenko v Auto Club Group*, 347 Mich App 635, 640; 16 NW3d 557 (2023) ("an agreement that violates the laws of Michigan is unenforceable as written.").[8]

## D. WHETHER THE CITY DID CONTRACT OUT ITS ZONING POWER

Nevertheless, we again conclude that the City did not contract out its zoning power to the JPC. The Master 425 Agreement created the JPC and directed that it "shall control all land usages for lands subject to a 425 Agreement between the City and Township . . . ." The Master 425 Agreement also specified that, "[i]n the event a zoning ordinance is amended and a definition changed, the definition shall not be changed for the purpose of this Agreement without the mutual consent of the City and Township." As for the "details of the organization and conduct of the JPC[,]" these were provided in Schedule A. Schedule A specified that the land "shall be administered" by the JPC "pursuant to" either the City's or the Township's "zoning and planning acts" based on certain geographic boundaries and instructed that the JPC will follow the respective "procedures and definitions" of those municipalities.

As we noted in *Marshall I*, the Committee puts misplaced emphasis on the fact that the Master 425 Agreement granted the JPC "control" over "land usages" as evidence that it was necessarily given authority over zoning classification. But this interpretation, without context,

---

[8] We recognize that the JPC has a unique make-up, as it is comprised of representatives of the City and the Township. But the fact that the JPC's members are representatives of the actual "local units" in this case does not mean that their positions confer the same definition to the JPC. Cities, townships, and villages are specifically defined entities in Michigan law. Regardless of its membership composition, the JPC is none of them. Moreover, these representatives derive their authority from their positions within their respective local units; it is not inherent to them as individuals, and they cannot bring it with them to other bodies simply by virtue of membership.

conflicts with the plain language of the agreement. If it were true that the JPC was granted exclusive authority over zoning, then the agreement would have no reason to specify what definition applied "[i]n the event a zoning ordinance is amended and a definition changed[.]" Further, the fact that Schedule A instructs the JPC to administer the land "pursuant to" the applicable "zoning and planning acts" indicates that the JPC was to "control" the "land usages" within the confines of the zoning ordinances enacted by the authorized municipality. Nothing in the Master 425 Agreement "prevented the City from amending its zoning map to change a classification." *Marshall I*, ___ Mich App ___; slip op at 23. Accordingly, "[t]he JPC had to accept any changes to the applicable zoning stated in the City's act as a matter of course, unless the change affected a definition." *Id*. Ordinance 2023-08 did not change any definitions, and, even if it had, the JPC would still be required to use the land in accordance with the zone change itself; the only difference is that the original definition that was changed would control. Because the Master 425 Agreement did not deprive the City of its authority to Ordinance 2023-08, Count IV was properly dismissed.

## VII. CROSS-APPEAL

Finally, we again conclude that we lack jurisdiction to rule on the MEDC's and the MSF's cross-appeal.

### A. STANDARD OF REVIEW

We review whether this Court has jurisdiction to consider an appeal de novo. *Chen v Wayne State Univ*, 284 Mich App 172, 191; 771 NW2d 820 (2009). Whether this Court has jurisdiction is always within the scope of this Court's review. *Id*.

### B. JURISDICTION

This Court has jurisdiction of an appeal of right filed by an "aggrieved party." MCR 7.203(A). Moreover, "[w]hen an appeal of right is filed or the court grants leave to appeal, any appellee may file a cross appeal." MCR 7.207(1). Black's Law Dictionary defines an appellee as "[a] party against whom an appeal is taken and whose role is to respond to that appeal, usu[ally] seeking affirmance of the lower court's decision." *Black's Law Dictionary* (12th ed). The MEDC's and the MSF's cross-appeal seeks review of the trial court's denial of their motion to intervene. But, because the trial court denied their motion to intervene, they were never parties to the underlying lawsuit. "Only aggrieved *parties* have an appeal of right under MCR 7.203(A)[,]" and "only a *party* can be an appellee with a right to cross-appeal a decision under MCR 7.207(A)(1)." *Marshall I*, ___ Mich App at ___; slip op at 24. Because neither the MEDC or the MSF were parties to the underlying suit, we lack jurisdiction over an appeal as of right or a cross-appeal under MCR 7.203 and 7.207. Moreover, the time for the MEDC and the MSF to seek leave to appeal under MCR 7.203(B)(1) has passed, MCR 7.205(A)(1)(a), as has the time for this Court

to treat the claim as a delayed application for leave to appeal, MCR 7.205(A)(4)(a).[9] Accordingly, we dismiss the MEDC's and the MSF's cross-appeal for lack of jurisdiction.[10]

Affirmed.

/s/ Thomas C. Cameron
/s/ Brock A. Swartzle
/s/ Adrienne N. Young

---

[9] As we noted in *Marshall I*, ___ Mich App at ___; slip op at 25 n 13, we decline to address the Committee's request to find the MEDC's and the MSF's appeal to be vexatious or impose sanctions, because the Committee did not properly raise the request in a motion. MCR 7.211(C)(8).

[10] In their supplemental briefing, the parties and amici raise various alternative arguments on issues that fall outside the scope of this remand. Our Supreme Court remanded this case to us to reconsider our decision in light of *Clam Lake Twp*. *Marshall II*, 25 NW3d at 318. "When an appellate court remands a case with specific instructions, it is improper for a lower court to exceed the scope of the order." *Int'l Bus Mach, Corp v Dep't of Treasury*, 316 Mich App 346, 350; 891 NW2d 880 (2016) (quotation marks and citation omitted). The Committee argues that, because our previous opinion was vacated in its entirety, this Court may reconsider other issues previously decided. It cites *Troy v Papadelis*, 226 Mich App 90, 94; 572 NW2d 246 (1997), in which this Court, on remand, reasoned that, because its prior opinion was vacated, the law-of-the-case doctrine did not apply, and each issue had to be reconsidered. But *Troy* and the case on which it relied, *Hill v Ford Motor Co*, 183 Mich App 208, 212; 454 NW2d 125 (1989), merely stand for the proposition that the law-of-the-case doctrine does not apply when our Supreme Court vacates one of our opinions, because "the law of the case announced in the higher appellate court supersedes that set forth in the intermediate appellate court." *Hill*, 183 Mich App at 212. We are bound by the law of the case announced by our Supreme Court in *Marshall II*, but no such law of the case was announced pertaining to anything besides *Clam Lake Twp* and its application. Moreover, regardless of whether we are bound by the law of the case of our prior opinion, the fact remains that we are required to strictly comply with the instructions provided in the remand order. See *Rodriguez v Gen Motors Corp*, 204 Mich App 509, 514; 516 NW2d 105 (1994).

*Clam Lake Twp* has no impact on any issue besides Issue VI. Accordingly, our reissuing of this opinion in full is merely the result of the vacation of our prior opinion, because the other arguments raised initially on appeal remain before us. But the only addressable substantive change to our previous analysis concerns the impact *Clam Lake Twp* has on this case. See *Rodriguez*, 204 Mich App at 514; *Int'l Bus Mach, Corp*, 316 Mich App at 350. Thus, although phrased differently, the substance of our analysis on the other issues remains the same.